2025 PA Super 146

| | | |
|---|---|---|
| IN THE INTEREST OF: R.S.A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3280 EDA 2024 |

Appeal from the Decree Entered November 21, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000212-2024

BEFORE:   PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY PANELLA, P.J.E.:                    **FILED JULY 15, 2025**

T.D. ("Mother") appeals from the decree entered in the Court of Common Pleas of Philadelphia County involuntarily terminating her parental rights to R.S.A.D. ("Child").[1] Counsel has petitioned to withdraw pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).[2] After careful review, we affirm the decree and grant counsel's petition.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The same day, the court entered a decree involuntarily terminating the parental rights of unknown putative father. No appeal has been filed from that decree.

[2] **See In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending **Anders** to appeals from decrees of involuntary termination of parental rights); **see also In re S.M.B.**, 856 A.2d 1235, 1237 (Pa. Super. 2004) (explaining that
*(Footnote Continued Next Page)*

We glean the pertinent facts from our review of the certified record.

DHS has a long history with Mother, who tested positive for marijuana at the birth of Child's older sibling, N.S., in 2008, and was convicted of drug-related offenses in 2009. Mother's parental rights to N.S. were terminated in 2014. Permanent legal custody of Child's sibling, S.S., was awarded to Child's current resource parents in 2016. Mother's parental rights to Ni.S. and R.S. were involuntarily terminated in 2017 and 2018, respectively. Mother has a history of drug use, unstable housing, and was previously diagnosed with depression and bipolar disorder, although she was not engaged in mental health treatment.

DHS removed Child from Mother's custody due to mental health concerns at the time of Child's discharge from the hospital after her January 2020 birth at Temple University Hospital ("TUH"). When DHS went to TUH to meet with Mother about Child, she yelled at DHS and threatened the TUH social worker. Mother refused to sign releases or provide any placement resources for Child. DHS obtained an order for protective custody ("OPC") and placed Child in foster care through NorthEast Treatment Center ("NET"), where she currently remains.

_____

the **Anders** procedure for withdrawal of court-appointed counsel has been extended to appeals involving termination of parental rights).

On February 13, 2020, Child was adjudicated dependent and an Aggravated Circumstances Order was entered against Mother due to her parental rights to 3 other children being terminated in 2014, 2017, and 2018. At the time Child was adjudicated dependent, Mother was living in a shelter and was unemployed. The court referred Mother to the Achieving Reunification Center ("ARC") for anger management counseling and family school and to Behavioral Health Services ("BHS") for consultation, evaluation, and monitoring. Mother was ordered to comply with all services and recommendations and sign releases. According to the DHS investigator, DHS had no drug and alcohol concerns, but Mother had untreated mental health issues and was not taking her medication for PTSD and bi-polar disorder. In conflict with records, Mother denied any mental health issues.

On February 24, 2020, the Community Umbrella Agency ("CUA") held an initial Single Case Plan ("SCP") meeting for Child. Mother's parental objectives were: (1) participate in CUA services and court recommendations; (2) comply with anger management through ARC; (3) attend Child's medical appointments; (4) attend family school; (5) attend supervised visitation; (6) inform the CUA when she leaves the shelter to allow for a new home evaluation; (7) participate in mental health treatment; (8) explore employment once mentally cleared; and (9) sign all releases of information.

At the initial permanency review hearing on September 11, 2020, Mother was rated moderate in achieving her SCP objectives and minimal in

alleviating the circumstances that led to Child's removal. The court referred Mother to ARC for parenting and directed her to sign all releases. Although Mother was now living with her paramour, Mother's name was not on the lease and Mother remained unemployed.

Mother failed to appear at the January 25, 2021 permanency review hearing, where the court ordered her to provide proof of attending parenting at ARC, her new address and lease, and income; and to make herself available for a home assessment.

At the September 29, 2021 permanency review hearing, the court ordered, in addition to all previously ordered objectives, that Mother comply with Rapid Response Housing requirements to maintain stable housing and provide the CUA with proof that she was looking at housing options. Mother's situation then took a very positive turn, and at the October 15, 2021 permanency review hearing, Mother was found to have completed all SCP objectives other than housing, and her visits with Child were increased from supervised to unsupervised overnight visitation. On December 21, 2021, Mother was rated fully compliant with her SCP objectives. On February 4, 2022, Mother's objectives remained the same, with the addition that she participate in mental health treatment until completion.

Events then took a turn for the worse. Mother failed to attend the March 21, 2022 permanency review hearing. CUA caseworker, Beverly Jackson, testified Mother was not responding to outreach to inspect her home. The

court rated Mother non-compliant, and ordered Mother to make herself available and to report to the Clinical Evaluation Unit ("CEU") for a drug and alcohol screen, assessment, and 3 random drug screens before the next hearing date. Visitation reverted to supervised because it had become sporadic.

The July 8, 2022 permanency review hearing was continued, but the court ordered Mother to the CEU for a forthwith drug and alcohol screen and 3 random screens before the next hearing. The same day, Mother tested positive for marijuana.

At the September 2, 2022 permanency review hearing, Mother was rated moderate in completing her SCP objectives and "none" in alleviating the circumstances that led to Child's removal. Mother was not taking her mental health medications to treat PTSD and bipolar disorder. Mother was ordered to complete drug screens at the CEU and to provide the CUA with her psychological evaluation and continue her mental health treatment. The court permitted weekly unsupervised visitation.

On February 10, 2023, the court found Mother was moderately compliant with the permanency plan, and on May 12, 2023, it found Mother substantially compliant, but ordered she continue to obtain drug and alcohol testing. It permitted Mother overnight visitation with Child.

On September 25, 2023, Mother tested positive for marijuana.

Mother was rated substantial in both completing her SCP objectives and alleviating the circumstances that led to Child's placement at the October 20, 2023 permanency review hearing. Mother was ordered to provide her medical marijuana card to the CUA and, if she does not have one, to continue with drug testing. Although visits had returned to unsupervised, Jackson had concerns because Mother was still not in family school, and Child was old enough that she was declining visits. Although Child was not old enough to have visitation at her discretion, it was a physical struggle to get Child to attend.

At the time of the February 16, 2024, permanency review hearing, Child had been in placement for 3 ½ years. Mother was rated substantial in meeting her SCP objectives and minimal in alleviating the circumstances that resulted in Child's removal and placement. A video that showed Mother having an altercation with her paramour and Child intervening in an attempt to make it stop was discussed. Paramour was seen in the video berating Child and using foul language against her. Child testified she did not want to visit with Mother. Visits were changed to being at the Child's discretion. Mother was referred for domestic violence intervention.

DHS filed the subject petition for the termination of parental rights, and the court held a hearing. At the conclusion of the termination hearing, the orphans' court granted DHS's petition and involuntarily terminated Mother's

parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). Mother timely appealed.

Before we consider the merits of Mother's issues, we must consider counsel's application to withdraw in which he argues that Mother's appeal is wholly frivolous. *See In re Adoption of M.C.F.*, 230 A.3d 1217, 1219 (Pa. Super. 2020) ("[W]hen presented with an *Anders* brief, this [C]ourt may not review the merits of the underlying issues without first passing on the request to withdraw.") (citation omitted).

To withdraw, counsel must:

1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the appellant; and 3) advise the appellant that he or she has the right to retain private counsel or raise additional arguments that the appellant deems worthy of the court's attention.

*Commonwealth v. Redmond*, 273 A.3d 1247, 1252 (Pa. Super. 2022) (citation and brackets omitted). Counsel must also "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *In re J.D.H.*, 171 A.3d 903, 907 (Pa. Super. 2017) (citing *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005)). Additionally, the *Anders* brief must:

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling

- 7 -

case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Redmond*, 273 A.3d at 1252 (citing *Santiago*, 978 A.2d at 361). *Anders* and *Santiago* require substantial, not perfect performance. *See id.*

Instantly, counsel filed a petition to withdraw certifying his conscientious review of the record and determination that Mother's appeal is frivolous. Additionally, he attached a compliant *Millisock* letter informing Mother of her right to retain private counsel or proceed *pro se* and raise any additional points that she deems worthy of this Court's attention. He also served Mother with a copy of the *Anders* brief. Mother has not responded. The *Anders* brief sets forth the factual and procedural history, and the issues counsel believed might arguably support Mother's appeal, with citations to pertinent legal authority and to the record. Finally, he set forth his conclusion that the appeal was frivolous and his reasons therefore. Thus, counsel has satisfied the procedural requirements of *Anders*, and we will conduct an independent review to determine whether we agree with counsel that Mother's appeal is, in fact, frivolous.

Our standard and scope of review is well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

"Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result." ***In re M.G.***, 855 A.2d 68, 73 (Pa. Super. 2004) (citation omitted).

> We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

***Id.*** at 73-74 (citation omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. ***See*** 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses on the child's needs and welfare. ***See In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence. ***See In re***

*Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021); *see also Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

In this case, the court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). To affirm the underlying decree, however, we need only agree with the court's decision as to any one subsection of Section 2511(a), along with Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, we will focus our discussion on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> …
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of subsection (a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Section 2511(a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties[.]" *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). Section 2511(a)(2) grounds "are not limited to affirmative misconduct[;] … they may [also] include acts of refusal [and] incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by Interest of K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023) (citation omitted). We have long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443 (citation omitted).

In concluding that termination of Mother's parental rights was warranted under Section 2511(a)(2), the orphans' court considered Mother's failure to

- 11 -

make progress toward reunification and remedy the reasons for Child's removal. The court stated, in relevant part:

> The testimony reflects that while Mother did comply with many of [her SCP objectives], she has not had progress to alleviate the need for placement. As has been testified to, she did [] attend a medical appointment in addition to single case plan completion. Visits progressed to overnights back in May of 2023. Unfortunately, for the child's safety, the visits had to be suspended in January of this year. Visits were subsequently reinstated at the agency. And apparently two went well, according to the resource parent. But then, subsequently, [Child]'s behavior changed. She had tantrums on the way to visits. And, unfortunately, … in distress[, s]he urinated and defecated on herself, although she was fully potty trained. … The last visit was in May of 2024. And [Mother] stopped confirming visits in August of [2024]. … I find that conditions that necessitate placement will not be remedied in a reasonable amount of time.

N.T., 11/21/24, at 41-42 (paragraphing provided).

A review of the record supports the termination of Mother's parental rights under Section 2511(a)(2). The record reveals that, although Mother admittedly made progress in her SCP goals, she was unable to alleviate the causes of Child's removal and placement.

CUA case manager Timothy Alston testified that Child was removed from Mother's care at the time of Child's January 2020 birth. *See id.* at 7. Child was immediately placed in a resource home with her siblings, who previously had been removed from Mother's care. *See id.* Mother had untreated mental health issues and her SCP reunification objectives included obtaining suitable housing; attending anger management, parenting, and healthy relationships courses; undergoing a mental health evaluation and following through with

recommended treatment; attending Child's medical appointments; and participating in visitation with Child. *See id.* at 8-9. Although Mother completed many of her SCP objectives, including a 2020 housing course, Mother is living with her paramour and is not on the lease, so has not completed the requirement that she obtain stable housing. *See id.* at 9. Mother denied that the housing was unstable despite the fact that she could be forced to leave since she is not on the lease, and refused to seek another, more permanent solution despite knowing that unstable housing would delay reunification with Child. *See id.* at 13.

Visitation with Child began as supervised. *See id.* at 9. Mother could not explain why, after visits were modified to unsupervised in May 2023, Child began acting out, throwing tantrums, urinating and defecating on herself, and refusing visits. *See id.* at 10. However, in January 2024, visits were suspended and changed to supervised for Child's safety because the video of Child, Mother, and Mother's paramour showed Mother's paramour berating Child and using foul language, and Child yelling at paramour to stop yelling at Mother. *See id.* at 11. However, Mother remained in denial about the video, becoming defensive and aggressive, and angry that the visits had been changed to supervised. *See id.* at 12-14.

Kayla Thurman, the CUA case manager since July 2024, testified Mother's last visit was in May 2024 because the visits were at Child's discretion and she refused to visit with Mother between June 10, 2024 and August 27,

2024, because she does not like Mother's paramour, paramour's home is roach-infested, and Mother hit her. *See id.* at 17, 29. Mother was supposed to be calling every week to confirm whether or not a visit would be scheduled, but she stopped calling at the end of August 2024, approximately 3 months before the termination hearing. *See id.* at 18, 20.

In the nearly 5 years Child has been in placement, Mother attended only one of Child's doctor's appointments despite being made aware of when they were scheduled, has never sent Child any holiday gifts, and provides no parental guidance. *See id.* at 24. NET did not believe parent/child therapy would be appropriate. *See id.* at 27.

Based on the foregoing, we agree with the orphans' court that DHS provided clear and convincing evidence to support termination of Mother's parental rights. The record reflects Mother's actions, particularly her continued denial about the effect her living situation has on her housing requirements and Child's safety, have caused Child to be without essential care and control, and that Mother refuses to remedy the situation. Having found sufficient grounds for termination pursuant to Section 2511(a)(2), we turn to the orphans' court's finding that termination was proper under Section 2511(b), which affords "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). In making this determination:

[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the child[is] in a pre-adoptive home and whether [the child has] a bond with the[] foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

**K.T.**, 296 A.3d at 1105-06 (citations and quotation marks omitted).

Although a Section 2511(b) inquiry must include consideration of the bond between the parent and the child, the Court has explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained[.]" **Id.** at 1109. Thus, the extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010) (citation omitted). It is "within the discretion of the orphans' court to prioritize the safety and security of [children] over their bonds with their parents," and such an assessment will not be disturbed if supported by the record. **M.E.**, 283 A.3d at 839 (citation omitted).

- 15 -

In concluding that Child's developmental, physical, and emotional needs and welfare supported termination of Mother's parental rights, the orphans' court emphasized:

> It appears that [Child] pretty consistently stated that she did not want visits with [ M]other. And she refers to … [M]other by her first name, thinking that she is visiting mother. And refers to her resource parent, in her mind, [a]s her mother. … I find that termination of parental rights will not destroy an existing relationship, as none exists. It will not cause her irreparable harm. [Child]'s in the home she's been in for most of her life, at least her life since placement. And she has a bond with her resource parent, as well as the biological brothers that live in her home. She does not look to [Mother] to meet her needs. She looks to her resource parents to do that. … This child needs permanency. And I find that it is … in her best interest for the parental rights of [Mother] and any unknown [putative] father to be terminated ….

N.T., 11/21/24, at 41-42 (paragraphing provided).

The record supports the court's findings.

Child has lived in resource parent's home practically since her birth in January 2020. She calls Mother by her first name and considers her the "visit mom," while calling the kinship mother her real mother. *See id.* at 21. Child has no recollection of living with Mother and states she wants to remain in her kinship mother's home, as it is the only home she knows. *See id.* at 22. Two of Child's biological siblings live in the resource home and have been adopted by the resource parents. *See id.* at 23. Resource parents provide for all Child's needs, and Child is current on medical, dental, and vision care. *See id.* at 26.

The resource mother testified Child is fully integrated into the family, loves her siblings, with whom she shares a room, and is doing great. *See id.*

at 32, 36. At the time of the termination hearing, Child was to be starting kindergarten soon. *See id.* at 36. E.B. intends to adopt Child. *See id.* at 40.

CUA case manager Thurman testified reunification has been ruled out because Child cannot safely be returned to Mother's care. *See id.* at 25. She stated Child would not suffer irreparable harm if Mother's parental rights were terminated, but would suffer if she were removed from E.B.'s home, since it is the only home she has ever known, and her siblings also live there. *See id.* at 25, 30. She testified it would be in Child's best interest to be freed for adoption because Child needs stability. *See id.* at 30. Child's advocate agreed Child would suffer no permanent harm if Mother's rights were terminated.[3] *See id.* at 40.

_____

[3] The trial court found there was no conflict in Child Advocate, Fran Odza, Esquire, acting in a dual role of Child's guardian ad litem and legal counsel. *See* N.T., 11/21/24, at 40; *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235-36 (Pa. 2020) ("[A]ppellate courts should engage in *sua sponte* review to determine if [trial] courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). …[I]f the trial court appoints one attorney to represent both the child's best interests and legal interests, "appellate courts should review *sua sponte* whether the [trial] court made a determination that those interests did not conflict" prior to appointment.). As stated previously, the trial court ultimately determined that Child's legal and best interests do not conflict. While we remind the trial court that a conflict finding should be made prior to a formal appointment of counsel, we decline to elevate form over substance. *See In re T.S.*, 192 A.3d 1080, 1090 n.19 (Pa. 2018) (recognizing that it would "be a better practice for the court to place an order on the record formalizing the GAL's role for termination purposes" but declining "to elevate form over substance" in circumstances when it was clear that the child received appropriate legal representation despite the technical error.).

- 17 -

Based on the foregoing and our independent analysis of the record, we agree with counsel that Mother's issues on appeal from the decree terminating her parental rights pursuant to Section 2511(a)(2) and (b) are wholly frivolous and our review of the record does not reveal any overlooked non-frivolous issues. While we commend Mother for completing the majority of her objectives for reunification, the fact remains Child has been in placement for nearly five years, almost her entire young life. Mother is familiar with the system, as she has had her parental rights of Child's older siblings terminated. Mother refuses to make the changes necessary to put Child's safety and needs first. Therefore, we grant Counsel's petition to withdraw and we affirm the termination decree.

Counsel's petition to withdraw granted. Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/15/2025